SLT:SD

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**12 M 059**

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

      - against -

GUSTAVO ADOLFO JULIA,

          Defendant.

- - - - - - - - - - - - - - - - -X

AFFIDAVIT IN SUPPORT OF
APPLICATION FOR AN ARREST
WARRANT

(18 U.S.C. § 1956(h);
1956(a)(1); 21
U.S.C. § 963)

EASTERN DISTRICT OF NEW YORK, SS:

      GRAHAM KLEIN, being duly sworn, deposes and states that
he is a Special Agent of the Department of the Homeland Security,
Homeland Security Investigations ("HSI"), currently assigned to
the El Dorado Task Force ("the Task Force"), duly appointed
according to law and acting as such.

      Upon information and belief, on or about November 5,
2010 to January 2, 2011, within the Eastern District of New York
and elsewhere, the defendant GUSTAVO ADOLFO JULIA did knowingly
and intentionally conspire to conduct financial transactions in
and affecting interstate and foreign commerce, to wit: the
delivery of United States currency, which involved the proceeds
of specified unlawful activity, to wit: narcotics trafficking,
knowing that the property involved in the financial transactions
represented the proceeds of some form of unlawful activity and

2

knowing that the transactions were designed in whole or in part
to conceal and disguise the nature, location, source, ownership
and control of the proceeds of said specified unlawful activity,
in violation of Title 18, United States Code, Section
1956(a)(1)(B)(I); the defendant GUSTAVO ADOLFO JULIA did
knowingly and intentionally conspire to conduct financial
transactions in and affecting interstate and foreign commerce, to
wit: the delivery of United States currency, which involved the
proceeds of specified unlawful activity, to wit: narcotics
trafficking, knowing that the transactions were designed in whole
or part to the carrying on of a specified unlawful activity, in
violation of Title 18, United States Code, Section
1956(a)(1)(A)(I); and the defendant GUSTAVO ADOLFO JULIA, did
knowingly and intentionally conspire to possess with intent to
distribute a controlled substance on an aircraft which was owned
or registered in the United States, contrary to Title 21, United
States Code, Section 959(b).

(Title 18, United States Code, Section 1956(h),
1956(a)(1)(A)(I); Title 21, United States Code Section 963)

The source of your deponent's information and the
grounds for his belief are as follows:[1]

---

[1]    Because the purpose of this Complaint is to state only
probable cause to arrest, I have not described all the relevant
facts and circumstances of which I am aware.

3

1.    I have been a Special Agent of HSI for more than eight years and have been assigned to the Task Force for over seven years.  The Task Force is designed to combat narcotics trafficking and money laundering.  Through my work with HSI and on the Task Force, I have participated in numerous money laundering investigations, during the course of which I have conducted or participated in surveillance, execution of search warrants, debriefings of informants and reviews of taped conversations and narcotics records.  Through my training, education and experience, I have become familiar with the manner in which narcotics are trafficked and the proceeds of illicit activities are laundered and the efforts of persons involved in such activity to avoid detection by law enforcement.

2.    The facts set forth in this affidavit are based in part on information that I have learned from review of written documents prepared by, and conversations with, members of HSI and other law enforcement agencies, and from review of various documents obtained by subpoena, request or database searches.

3.    The Task Force is conducting an investigation of a large-scale narcotics trafficking and money laundering conspiracy.  Members of the conspiracy operate in foreign countries, primarily Argentina and Spain and other places to import and distribute narcotics and launder the proceeds of this narcotics trafficking. This investigation was predicated upon the

4

seizure of a large quantity of cocaine aboard a US-registered jet by Spanish authorities. Based on this incident and subsequent investigation, Task force members seized a large quantity of US currency from two United States bank accounts.

       4.  By way of background, narcotics traffickers amass large cash proceeds from the sale of narcotics in the United States and elsewhere.  The traffickers, or those associated with the traffickers, frequently attempt to give the impression of legitimacy to these profits; i.e., to "launder" them by making the profits appear to have been generated by a legitimate source. The traffickers must also devise various methods to use those narcotics proceeds to promote their narcotics activity by paying the expenses of their illegal activities including remitting payment for the wholesale purchase of narcotics, the transportation of narcotics, and other costs associated with the distribution of narcotics.

       5.  In order to accomplish this goal, narcotics traffickers frequently utilize domestic and foreign banks and/or financial institutions in order both to make their narcotics profits appear to be from legitimate sources and to move those profits through the financial system.  These efforts frequently utilize "shell corporations" or businesses that purport to be legitimate businesses, but which in actuality have no assets, employees, or legitimate purpose.

5

6.    Additionally, these efforts often include numerous transfers of funds between accounts and businesses for no apparent or legitimate reason.  This process is called "layering" and involves adding layers of financial transaction between the illegal transaction that generated the funds and the ultimate destination of the funds in order to give the appearance of legitimacy to the funds and to make it harder to trace the funds back to an illicit source.

7.    It is also common as part of the layering and laundering process to include wire transfers of funds to and from stable political and economic countries with lax anti-money laundering rules such as the Cayman Islands, Curacao, St. Lucia, the Netherlands Antilles, and other similar countries.

**FACTS**

8.    On January 2, 2011, Spanish authorities detained a Challenger 604 private jet bearing tail number N600AM ("Challenger Jet") at Barcelona International Airport.  Inside the aircraft, Spanish authorities discovered approximately 944 kilograms of cocaine secreted in the interior of the aircraft. Specifically, the Spanish authorities discovered two couches inside the plane, both of which secreted the cocaine, as well as a compartment hidden behind an instrument panel in the tail section of the aircraft.  Based upon my knowledge and experience in investigating international money laundering and narcotics

6

cases, the average wholesale value price of a kilogram of cocaine sold in Spain is $45,000.  Accordingly, approximately 42 million dollars worth of cocaine was seized.

9.  GUSTAVO ADOLFO JULIA ("JULIA"), along with his brother Eduardo Antonio Julia Noceti ("Eduardo") and Gaston Matias Miret ("Miret") were aboard the aircraft.  All are citizens of Argentina.

10.  U.S. Federal Aviation Administration records shows that N600AM is registered to a company based in the United States named 604 Jet LLC ("604 Jet").  Records obtained from 604 Jet confirmed that 604 Jet owns N600AM and leased N600AM to JULIA and Eduardo in November 2010.

11.  A lease obtained from 604 Jet revealed that N600AM was leased to a company called Delaware GG, Inc. ("Delaware GG"), on November 5, 2010, through a broker, Jet Lease of Palm Beach, Inc. [2] The aircraft lease agreement was signed by JULIA and listed him as the president. Further, Delaware GG agreed to pay 604 Jet approximately $253,500 every three months for the lease of N600AM.  Delaware GG also agreed to pay 604 Jet separate fees

---

[2]    The investigation revealed that the initial aircraft lease was an agreement between 604 Jet and GG GOLD.  However, when it was discovered that GG Gold had been dissolved as a Florida corporation for failure to file an annual report, 604 Jet declined the lease.  Shortly thereafter, JULIA incorporated a company called Delaware GG on November 4, 2010 for the purpose of leasing N600AM. The articles of Incorporation list JULIA as one of the corporate officers.

7

of approximately $11,000 per month for maintenance and to pay approximately $400,000 as a security deposit for N600AM.  The term of the lease was one year.

12.  The investigation revealed that Jet Lease of Palm Beach Inc. acted as an intermediary between 604 Jet and JULIA. In an interview, a Jet Lease of Palm Beach Inc. employee, who assisted in the lease of N600AM, stated that JULIA and Eduardo stated that they wanted to lease a Challenger 604 which is the same model airplane as N600AM, in relation to a project they had in Spain. Prior to signing a lease with 604 Jet, JULIA and Eduardo made arrangements to wire transfer approximately $50,000 to Jet Lease of Palm Beach Inc's bank account to demonstrate their intent to proceed with a lease.

13.  As part of the investigation, I have obtained the bank account record for funds on deposit at J.P. Morgan Chase account number 4462287933 ("GG GOLD Account") in the name of GG Gold, Inc., and for all funds on deposit at J.P. Morgan Chase account number 4462287420 ("JULIA Account") in the name of GUSTAVO ADOLFO JULIA.  JULIA is a signatory on both accounts.

14.  Bank records reveal that in early November 2010, JULIA made three wire transfers totaling approximately $665,000 from a J.P. Morgan Chase bank account in the name of GG GOLD Inc. to Jet Lease of Palm Beach Inc's bank account.

8

15.  Further investigations revealed JULIA's brother
Eduardo attended pilot training at Flight Safety International
("Flight Safety"). Flight Safety's headquarters is in the United
States at the Marine Air Terminal, LaGuardia Airport, Flushing,
New York.  Eduardo also attended a course titled, "Challenger 604
Initial Pilot Training" in Arizona from October 4-23, 2010.

16.  Records obtained from Flight Safety show that a
company called Southern Valley Trading Limited ("Southern
Valley") wire transferred $34,000 to Flight Safety in New York on
October 5, 2010, for Eduardo's training. In this transaction,
JULIA paid Southern Valley approximately $34,000 in cash in or
around October 2010 to fund the aforementioned wire. The wire
transfer originated from First Caribbean International Bank in
the Netherlands Antilles. In addition, JULIA communicated with
Flight Safety via email on behalf of his brother.  By way of
background, the investigation revealed that JULIA began doing
business with Southern Valley in 2009.  Southern Valley is a
financial services business registered in the British Virgin
Islands., whose activities are conducted almost exclusively in
Argentina and Uruguay involving transactions with entities in the
United States.  Southern Valley conducts foreign exchange and
wire transfers on behalf of its clients.  Southern Valley is not
registered or authorized to conduct these activities in Argentina
and operates on the black market.  In addition, Southern Valley

purposely maintained accounts outside of Argentina to conceal its transactions from the Argentine government. For example, Southern Valley maintained bank accounts at Bank of Saint Lucia International in Curacao and at Administradora de Fondos De Inversiones Sur S.A. and Grupo Sur de Valores S.A in Uruguay.

17. JULIA used Southern Valley to conduct wire transfers from Argentina through Southern Valley's offshore bank accounts, which ultimately landed in the GG GOLD bank account at J.P. Morgan Chase. To accomplish these transactions, JULIA provided large amounts of cash U.S. currency to Southern Valley in Argentina, or, conversely received large amounts of cash from Southern Valley for incoming wire transfers. Southern Valley estimated that between 2009 and October 2010, it conducted approximately $1 million dollars in United States wires paid for on behalf of JULIA. Some of these transfers went to SOUTH AVIATION in the amount of $39,029 on August 13, 2010, Wright Brothers Aircraft Title in the amount of $100,000 on August 25, 2010 and GG GOLD INC in the amount of $30,000 on September 20, 2010. In addition, JULIA's personal bank account at JP Morgan Chase reflected a transaction in the amount of $10,900 on September 24, 2010. The investigation revealed that JULIA gave Southern Valley cash at their office for the majority of these transactions.

10

18. In October 2010, JULIA provided approximately
$290,000 cash in $100 bills (U.S. currency) to Southern Valley.
GUSTAVO informed personnel at Southern Valley that he intended to
make a payment on a plane in the coming days and would need the
money transferred to a particular account. On November 1, 2010,
while he was in the United States, JULIA telephoned Southern
Valley in Argentina and requested that $253,500 be transferred to
the GG GOLD ACCOUNT. On November 9, 2010, GUSTAVO appeared at
Southern Valley to collect approximately $33,421 in cash left
over from the transfer.

19. On November 1, 2010, the GG GOLD account wire
transferred $400,000 to Jet Lease of Palm Beach Inc. On November
2, 2010, the GG GOLD account wire transferred $253,500 to Jet
Lease of Palm Beach Inc. On November 2, 2010, the GG GOLD
account wire transferred $36,825.61 to Jet Lease of Palm Beach
Inc. Based upon the investigation, I believe these payments to
be for the security deposit, the first three month lease payment,
and other expenses related to N600AM.

20. According to the GG GOLD bank account records, on
December 8, 2010, a wire transferred $11,016.23 directly to 604
Jet. The payment detail of that wire indicated that it was for
N600AM. An invoice obtained from 604 Jet LLC indicated that the
payment was for maintenance on the Delaware GG, Inc. lease of
N600AM. On December 29, 2010, the GG Gold Inc. account also wire

11

transferred $697.50 to Triad Professional Services ("Triad") referencing work order 28607. A Triad employee confirmed that work order 28607 was for services rendered for the filing for Delaware GG, Inc's state of Delaware incorporation.

21. In addition, on November 5, 2010, a check was written from the GG GOLD account to Michael Glinsky, a certified public accountant who filed GG Gold Inc's Florida incorporation paperwork in June 2009. Records obtained from the State of Florida incorporation show Glinsky as the registered agent and Gustavo A. Julia as the President for GG Gold Inc. JULIA's signatures appear to be the same on the FL incorpoartion paperwork, the GG GOLD accout signature card, GG GOLD check written to Glinsky and the signature on final aircraft lease between Delaware GG Inc and 604 Jet for N600AM.

22. On January 11, 2011, the GG GOLD account wire transferred $409,000 to the JULIA account.

23. On September 21, 2010, the GG GOLD account received a wire transfer for $30,000 from an account held by Southern Valley at the Bank of Saint Lucia International. On December 23, 2010, GG GOLD account received a wire from UBS in Switzerland for $105,679.00 and on November 2, 2010, for $253,500 FROM SOUTHERN VALLEY's account. As discussed above, the GG GOLD account also sent a wire for $253,500 on November 2, 2010, to Jet Lease of Palm Beach Inc. for N600AM.

12

24.  In addition, the investigation revealed that the JULIA Account was funded by two wires: September 24, 2010, from Southern Valley (First Caribbean International Bank and routed through Wells Fargo) and January 11, 2011, from the GG Gold account.

25. On January 18, 2011, a warrant was signed by the Honorable Andrew L. Carter in the Eastern District of New York authorizing the seizure of the GG Gold account and the JULIA account. Approximately $569.71 was seized from the GG GOLD account and $417,143.48 was seized from the JULIA account.

26.  Based upon my training and experience, the activity described above is consistent with the laundering of narcotic proceeds.  I base my conclusions on the fact that both the GG GOLD account and the JULIA account: (a) are controlled by known participants in narcotics activity, (b) involves the use of potential shell corporations, (c) involves localities known to maintain lax anti-money laundering practices, (d) involves "layering," the use of multiple transactions and accounts for no apparent legitimate reason, and (e) were used to directly fund the transportation of almost one ton of cocaine on an aircraft registered in the United States.

13

        27.   WHEREFORE, your deponent respectfully requests
that a warrant be issued commanding the arrest of defendant
GUSTAVO ADOLFO JULIA.


                                    GRAHAM KLEIN
                                    Special Agent
                                    HSI

Sworn to before me this
 the 11th day of July, 2012


HONORABLE :
UNITED STA1
EASTERN DIS